***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times.
3. Liberty Mutual Insurance Company was the compensation carrier on risk at all relevant times.
4. Plaintiff's average weekly wage is $309.40 ($206.28 compensation rate) per week as calculated from the wage chart.
 ***********
Based upon the competent and credible evidence, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff worked as a foam rubber hand cutter for the employer for several years. At approximately 8:30 a.m. on Tuesday, 22 August 2000, plaintiff was doing her job and lifting some foam rubber which weighed about 20 pounds. As she lifted a block of foam rubber, plaintiff felt a pop in her neck and experienced the onset of left shoulder and neck pain. Plaintiff continued to work, but her pain worsened over the next several days.
2. Within the next fifteen minutes, plaintiff reported her injury to Tony Fisher, the plant manager. Mr. Fisher responded that she had probably slept on it the wrong way. Two other co-workers recalled plaintiff saying she hurt her neck, but they were uncertain of when she made this statement.
3. On 22 August 2000, plaintiff told her husband that she had hurt her neck lifting foam at work. After her injury, plaintiff's husband had to take her to and from work because plaintiff was unable to drive due to the pain.
4. Several days after the injury, plaintiff and her husband met with Tommy Fisher, the plant manager, and Robin Workman, an Administrative Assistant for defendant-employer. Plaintiff advised Tommy Fisher and Robin Workman that she had hurt her neck and needed to see a doctor. Ms. Workman asked Mr. Fisher if she should make an appointment with the company doctor and Mr. Fisher directed plaintiff to see her own doctor first.
5. Defendants' records include a 1st Report of Injury which documents that plaintiff reported her injury on 28 August 2000, and that plaintiff reported she hurt her upper back while lifting foam at work.
6. According to plaintiff's recorded statement taken on 7 September 2000, she first sought treatment at "The Spine Center" on Friday, 25 August 2000. Plaintiff stated that she already had an appointment to see a doctor approximately one week later (which would have been on or about 8 September 2000) for her pre-existing low back problems, but she called to move her appointment up due to the severe pain caused by her neck and shoulder injury. Plaintiff's testimony is consistent with a nurse's note (Ex. p. 104) indicating that Dr. Lawrence Caldwell was referring plaintiff to Dr. McClosky and an appointment was being made for 8 September 2000. Apparently, plaintiff was able to move up the appointment to 25 August 2000, but she saw Dr. Gutting instead of Dr. McClosky. Plaintiff did not appear to remember her one-time examination by Dr. Gutting when she testified at the hearing before the Deputy Commissioner, but this was the same treatment referred to in her recorded statement.
7. Dr. Gutting's 25 August 2000 consult note creates some confusion in this case regarding plaintiff's history; however, he was unavailable to clarify the confusion. There are no records of any information plaintiff might have completed on her own or of a detailed history taken by someone at Dr. Gutting's office on 25 August 2000.
8. Dr. Gutting's examination of plaintiff on 25 August 2000 revealed acute pain with difficulty moving her head or her torso from side to side. Dr. Gutting diagnosed "diffuse pain symptoms" without distinguishing between acute neck pain and chronic low back pain. Rather, Dr. Gutting appears to have lumped all of plaintiff's pain symptoms together and referred her to a pain clinic.
9. Little weight is given to the medical record of Dr. Gutting which references a two week history of neck pain with pain into plaintiff's left arm and hand. Given other medical records and testimony taken in this case, the reference to two weeks appears to be an error on the part of Dr. Gutting. Plaintiff had been referred to Dr. Gutting by plaintiff's family physician, Dr. Lawrence Caldwell. When plaintiff was examined by Dr. Caldwell on 11 August 2000, she did not report neck, shoulder or arm pain. Dr. Caldwell ordered an MRI of plaintiff's lower back. He did not order a cervical MRI. The undersigned also note that 25 August 2000, the date of Dr. Gutting's examination of plaintiff, is exactly two weeks from the date of plaintiff's examination by Dr. Caldwell where she had no complaints of cervical pain.
10. Plaintiff also did not mention neck pain to Dr. Caldwell on 14 August 2000, after her flexible sigmoidoscopy procedure. Further, no reference of neck pain was made to Dr. Caldwell's nurse Michelle on 21 August 2000, when Michelle advised plaintiff of her appointment with Dr. McClosky (Ex. p. 104).
11. On Tuesday, 29 August 2000, plaintiff presented to Physician's Assistant Alicia Sigmon at Conover Family Practice. Plaintiff gave a history of injuring her neck on 22 August 2000 while lifting foam at work. She was assessed with a cervical strain and low back problems and was written out of work until Friday, 1 September 2000.
12. At defendants' direction, on 30 August 2000 plaintiff presented to Dr. Jay Piland at the Hart Industrial Clinic. Again, plaintiff gave a history of injuring her upper back while lifting foam at work on 22 August 2000. Dr. Piland diagnosed plaintiff with bilateral cervical and trapezius strain and limited plaintiff's work activities to light duty with no lifting over 25 pounds and limited bending, twisting and lifting through 4 September 2000. He treated plaintiff with medication and sent her to physical therapy, which plaintiff began on 1 September 2000.
13. Plaintiff returned to Dr. Piland on 6 September 2000. Plaintiff reported some improvement with physical therapy, but that her work activities were making her symptoms worse. Dr. Piland diagnosed persistent cervical and trapezius strain, and recommended additional physical therapy and reduced her lifting restriction to five pounds.
14. Following an examination on 13 September 2000, Dr. Piland noted that plaintiff's problems persisted, and he recommended that plaintiff be issued a TENS unit to help control her pain.
15. Plaintiff continued to attempt to work during this period, but on 15 September she developed increasing pain and spasms while at work and was taken to the Hart Industrial Clinic by Robin Workman and a co-worker, Debbie Sigmon. Dr. Piland noted plaintiff's symptoms were increasing, and he continued her light duty work limitations.
16. Following an examination of plaintiff by Dr. Piland on 20 September 2000, he noted that her symptoms were resolving. Dr. Piland contacted Robin Workman and requested that plaintiff be permitted to change jobs to one which would allow alternate sitting, standing and walking, and which would not require lifting of over five pounds. Dr. Piland's office note further states that defendants had not given approval for further physical therapy at that time.
17. Plaintiff next presented to Dr. Duncan A. McCall of Piedmont HealthCare on 20 September 2000. Dr. McCall noted the work-related injury of 22 August 2000, and after examining plaintiff, diagnosed her with "muscle pain and spasm related to work injury which may have a component of a bulging disc with it." Dr. McCall arranged for plaintiff to undergo an MRI of her cervical spine and continued her medications.
18. On 10 October 2000, plaintiff returned to Conover Family Practice and was seen by Dr. David G. Coffey, III. Dr. Coffey noted that plaintiff continued to work for defendant-employer, and that her symptoms had continued as a result. He further noted that defendant-employer had ruled that plaintiff did not have a workers' compensation claim, and that they wanted her evaluated by Carolina Orthopaedic Specialists. Dr. Coffey diagnosed plaintiff with a cervical strain and made plans to set plaintiff up with Carolina Orthopaedic Specialists for evaluation and treatment. He gave plaintiff an out of work note until the orthopedist could evaluate plaintiff and determine the appropriate course of action.
19. On 12 October 2000, plaintiff presented to Dr. Robert Liljeberg of Carolina Orthopaedic Specialists. Plaintiff reported the onset of neck pain on 22 August 2000 following lifting foam at work. Dr. Liljeberg diagnosed plaintiff with a cervical sprain and opined that "she will find lifting foam from floor to waist and waist to overhead unsatisfactory and I believe that she will probably never be able to do this comfortably." Dr. Liljeberg recommended a permanent job change.
20. Plaintiff has not returned to work since 12 October 2000.
21. Plaintiff returned to Dr. McCall on 17 October 2000. Dr. McCall reviewed the results of the MRI taken on 26 September 2000 and noted that it did show disc bulges in the cervical spine, but opined that they were not to the point of requiring surgery. Dr. McCall continued to treat plaintiff and on 20 February 2001 he diagnosed her with fibromyalgia. On 3 April 2001, Dr. McCall treated plaintiff for a "significant muscle spasm present in the area of the neck and shoulders." He referred plaintiff to orthopedic surgeon Dr. Kenneth Wood of Piedmont HealthCare.
22. Dr. Wood reviewed plaintiff's 26 September 2000 MRI and concluded that plaintiff had disc herniations at C5-6 and C6-7. Dr. Wood recommended surgery to correct the condition, which he performed on 2 July 2001. Based upon the history of plaintiff's injury he was provided, Dr. Wood opined that the foam lifting incident at work on 22 August 2000 caused or aggravated plaintiff's disc herniations. On 23 August 2001, Dr. Wood found plaintiff to have reached maximum medical improvement and he released her without restrictions. Dr. Wood gave plaintiff a 15% permanent partial disability rating to her neck.
23. Little weight is given to the 20 August 2000 medical note which appears to indicate that plaintiff experienced "low back and upper pain" while working on a car. This note refers to something which happened a year before plaintiff's current injury. Plaintiff's treatment records from the weeks immediately before her neck injury on 22 August 2000 do not note any complaints of neck pain.
24. By the time plaintiff gave her Recorded Statement on 7 September 2000, she had given a consistent history of injuring her neck at work while lifting foam on 22 August 2000 to (1) her husband on 22 August 2000; (2) Tommy Fisher and Administrative Assistant Robin Workman on 28 August 2000, who completed a Report of Injury on 31 August 2000 documenting how the injury occurred; (3) Physician's Assistant Alicia Sigmon on 29 August 2000; (4) Dr. Jay Piland of the Hart Industrial Clinic on 30 August 2000 and on 6 September 2000; and (6) Diane Deal, the physical therapist at the Hart Industrial Clinic on 1 September 2000.
25. Little weight is given to plaintiff's failure to immediately report her injury to defendant-employer's nurse. There was no evidence presented that this was the accepted and known procedure at defendant-employer's plant. Based on the medical evidence, it appears that plaintiff's low back injury of 24 June 1999 was work-related, but there is no evidence that plaintiff missed time from work for this injury or that she filed a workers' compensation claim. There is no indication that plaintiff reported her low back injury to the plant nurse although she did seek medical treatment with Dr. Robert Hart following the injury.
26. No weight is given to defendants' contention that plaintiff had a pre-existing neck injury. In Dr. Hart's note of 14 July 1999, he comments that "Patient is complaining of some mild pain with flexion of the neck." This comment refers to Dr. Hart's examination procedure for plaintiff's 24 June 1999 work-related injury. Plaintiff had not complained of neck pain. Plaintiff continued to seek treatment for low back pain up to and after her 22 August 2000 neck injury.
27. Based upon the greater weight of the evidence, plaintiff injured her neck on 22 August 2000 while lifting foam at work. Plaintiff's testimony regarding the injury and how it happened is accepted as credible by the Full Commission.
28. As a result of her injury, plaintiff was unable to work from 12 October 2000 until 23 August 2001, when she was released without restrictions by Dr. Wood. Because the hearing before the Deputy Commissioner occurred shortly after Dr. Wood released plaintiff, the evidence does not reflect whether plaintiff's permanent partial disability affects her wage earning capacity under either N.C. Gen. Stat. § 97-29 or § 97-30. For this reason, the Full Commission is unable to determine whether plaintiff's remedy under N.C. Gen. Stat. §§ 97-29, 30 or 31 would be more beneficial to plaintiff.
29. Plaintiff's average weekly wage was $309.40 per week as calculated from the wage chart, yielding a weekly compensation rate of $206.28.
 ***********
Based upon the foregoing Stipulations and Findings of Facts, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered an injury in the course and scope of her employment with defendant-employer on 22 August 2000, as a direct result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2.
2. As a result of her injury by accident, plaintiff was totally disabled from 12 October 2000 until 23 August 2001 and is entitled to weekly benefits under the Act in the amount of $206.28 during that period. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants pay interest at the rate of 8% on the above compensation from 27 September 2001 until paid. In addition, plaintiff is entitled to have defendants pay interest at the rate of 8% on any medical bills related to her compensable injury which defendants have not paid prior to this Opinion and Award, from 27 September 2001 until paid. N.C. Gen. Stat. § 97-86.2; Childress v.Trion, Inc., 125 N.C. App. 588, 481 S.E.2d 697, disc. review denied,346 N.C. 276, 487 S.E.2d 541 (1997).
4. Plaintiff is entitled to have defendants pay for all past medical treatment and any necessary future treatment related to her neck injury, including the 2 July 2001 surgery performed by Dr. Wood. N.C. Gen. Stat. § 97-25.
5. Pursuant to N.C. Gen. Stat. § 97-31(23), plaintiff would be entitled to 45 weeks of permanent partial disability compensation at the weekly rate of $206.28; however, because the hearing before the Deputy Commissioner occurred shortly after Dr. Wood released plaintiff, the evidence does not reflect whether plaintiff's permanent partial disability affects her wage earning capacity under either N.C. Gen. Stat. § 97-29 or § 97-30. For this reason, the Full Commission is unable to provide sufficient findings to permit plaintiff to elect the most beneficial remedy. Therefore, this issue is held in abeyance pending further presentation by the parties to the Commission regarding plaintiff's post-release wage earning capacity or the parties' execution of a Form 26 Agreement for Payment of Compensation. Strickland v.Burlington Indus., Inc., 87 N.C. App. 507, 361 S.E.2d 394 (1987).
 ***********
Based on the foregoing Findings of Facts and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay to plaintiff total disability compensation in the amount of $206.28 per week from 12 October 2000 through 23 August 2001. Said amount shall be paid in a lump sum subject to attorney's fees approved below.
2. Defendants shall pay directly to plaintiff interest on the above award at the rate of 8% from the 27 September 2001 date of the hearing before the Deputy Commissioner until paid in full. This award is not subject to attorney's fees.
3. Defendants shall pay for all medical treatment received by plaintiff or to be received in the future which is related to her compensable work-related injury by accident. In addition, defendants shall pay directly to plaintiff interest on all unpaid medical bills at the rate of 8% from the date of the hearing before the Deputy Commissioner until paid in full.
4. Plaintiff's counsel is entitled to attorney's fees in the amount of 25% of the award in Paragraph 1 above. One fourth of the lump sum payment shall be paid directly to plaintiff's counsel.
5. The issue of plaintiff's election of benefits between her permanent partial disability rating of 15% and possible continuing disability pursuant to N.C. Gen. Stat. §§ 97-29 or 30 is hereby held in abeyance pending the presentation of further evidence by the parties or an agreement reached between the parties.
6. Defendants shall pay the costs of this action.
This the ___ day of March, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN